UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUN COMMUNITIES, INC.,                    Case No. 23-cv-10618

     Plaintiff,                          Hon. F. Kay Behm
v.                                        United States District Judge

NAVIGATORS INSURANCE
COMPANY,

     Defendant.
_____ /

**OPINION AND ORDER ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (ECF No. 43)**

## I.   PROCEDURAL HISTORY

This case is about an insurer's alleged failure to participate in
settlement discussions and contribute to the eventual settlement of a
separate underlying lawsuit in good faith.  The insured, Sun
Communities, Inc., filed a complaint against its excess insurer
Navigators Insurance Company on March 16, 2023.  ECF No. 1.  The
court previously heard, and denied, a motion for judgment on the
pleadings brought by Navigators, in which they argued that they were
entitled to judgment as a matter of law based on Sun's violation of the
terms of the underlying insurance policy.  ECF No. 17 (motion), 28

(order denying the motion).  This matter is now before the court on
Navigators' subsequent Motion for Summary Judgment (ECF No. 43).

For the reasons explained below, the court **DENIES** the motion.

## II.   FACTUAL BACKGROUND

This case arises from a dispute over who ought to pay (or ought to
have paid) in the settlement of a separate, though related lawsuit that
followed the tragic death of a young girl.  While resolution of this
motion requires a recitation of a detailed timeline of facts, the relevant
factual record is often undisputed.

Sun Communities is a "fully integrated real estate investment
trust that acquires, operates, develops, and expands manufactured
home and RV communities."  ECF No. 1, PageID.2.  As part of its
operations, Sun maintains several layers of insurance coverage for any
personal injury claims that may arise at its properties.

On or about April 3, 2021, a three-year old child, Emma Davidson,
fell into a septic tank at a campground/RV resort owned by Sun in Cape
May, New Jersey, and tragically died as a result of her injuries.  ECF

No. 48, PageID.1892 (admitting facts at ECF No. 43, PageID.1060).[1] On or about June 28, 2021, Emma's parents, as administrators of her estate and on their own behalf, filed suit against Sun and others in the Superior Court of New Jersey, Law Division – Cumberland County, Case No. CUM-L-000462021 (the "Davidson Lawsuit"),[2] alleging claims for wrongful death, survival, negligent infliction of emotional distress, punitive damages, and intentional infliction of emotional distress.  ECF No. 43, PageID.1060.

### A.    Sun's Insurance Layers

Sun had a total of $101 million in insurance as follows:

- $1,000,000   – Lexington (AIG) primary policy
- $10,000,000 – Allied World first excess policy
- $15,000,000 – Navigators second excess policy
- $25,000,000 – AXA XL (XL) third excess policy
- $25,000,000 – Federal (Chubb) fourth excess policy
- $25,000,000 – American Guarantee (Zurich) fifth excess policy

*Id.* (citing ECF No. 43-2, PageID.1089, 7/27/21 Bell email).

---

[1] From here on, the court cites directly to statements of fact when admitted; where facts are disputed or the underlying testimony is cited, the court cites to the record.

[2] The court referred to this suit as the "Cape May Lawsuit" in its prior order, *see* ECF No. 28, PageID.440, but the parties use the "Davidson Lawsuit" in their briefings on this motion, and the court adopts that term.

Sun requested insurance coverage for the Davidson Lawsuit from its insurers.  Sun's primary insurer, Lexington (an AIG company), assigned attorney Jeffrey Bell as Sun's defense counsel to represent and defend Sun in the Davidson Lawsuit.  ECF No. 43, PageID.1060. Navigators issued the second layer excess insurance policy to Sun, Policy No. GA20FXR920925IV, with a policy period of November 29, 2020 to November 29, 2021 (the Navigator's Policy).  *Id.*  Because the Navigators Policy was excess over the Lexington and Allied World policies, coverage under the Navigators Policy was not triggered unless and until those underlying policies' $11 million policy limits were exhausted.  *Id.* (citing ECF No. 43-6, PageID.1120 (Navigators Policy Section I.1.a.: "We will pay those sums the insured becomes legally obligated to pay as damages … that exceed the 'underlying limits' paid by 'underlying insurance *with our consent*.")) (emphasis in Defendant's brief).  The Navigators Policy incorporated certain conditions contained within the Allied World policy, including the following voluntary payment provision: "No Insured will, except at that Insured's own cost, voluntarily make a payment, assume any obligation

or incur any expense, other than for first aid, without our consent." *Id.* (citing ECF No. 43-7, PageID.1136, 12/7/22 Hanson email to Bell).

## B.    Bell's Reports to the Insurers

Within a month after the Davidson plaintiffs filed their lawsuit, on July 27, 2021, Bell reported to Sun's insurers (including Navigators) and Sun's corporate counsel Mark Cooper (also Sun's counsel in this case) that "[i]n my opinion, while the initial demand may extend into higher layers, this case should settle in the [Allied World] layer. However, I do feel it is prudent to copy Navigators (Hartford)." ECF No. 43-2, PageID.1089 (7/27/21 Bell email).  According to Sun, Bell included Navigators in his reporting from the start of the process because he always believed Sun's exposure could reach Navigators' layer ($15 million excess to $11 million in coverage [the "Navigators Policy"]).  ECF No. 48, PageID.1893 (referring to ECF No. 43-28, PageID.1474 (Bell Dep. 16:8-17:21)).  In his initial report, Bell stated "[w]e believe an early and quick resolution through direct negotiations and/or ADR should take place." ECF No. 43-11, PageID.1206 (7/27/21 Bell Report).  Bell stated that "Plaintiffs will have very strong arguments as to liability against [Sun]." *Id.* at PageID.1198.  In that

initial report, he reported a "preliminary settlement value of $2,000,000.00 to $4,000,000.00, and a potential verdict value of $4,000,000.00 to $6,000,000.00."  ECF No. 43-11, PageID.1205.

On October 26, 2021, Bell prepared an updated report in which he informed Sun's counsel and its insurers (including Navigators) that "we will continue with defending this matter" and "we will continue our efforts to guide this matter towards Mediation."  ECF No. 43-12, PageID.1232 (10/26/21 Bell Report).[3]  Bell's report contained detailed summaries of discovery that had taken place to that point, including the dashcam/body worn camera videos that they had obtained from the local police.  Bell stated that "it remains our opinion that Plaintiffs will have very strong arguments as to liability against [Sun]."  ECF No. 43-12, PageID.1227.  He also opined as to damages and stated, for example, "given the circumstances as to how and where she drowned, we expect a jury will put a high valuation on this case for her pain and suffering, almost irrespective of the actual amount of time she remained conscious."  ECF No. 43-12, PageID.1231.  Bell also noted in that

---

[3] A word of caution: please note that the October 26, 2021 report and December 5, 2021 report both contain images that depict the loss of life of a child and may be disturbing.

6

October 26, 2021 report that "Plaintiffs appear to have focused their attention on pursuing punitive damages" and that they would "use their claim for punitive damage as leverage to try and inflate the value of their claim for compensatory damages." *Id.* at PageID.1232.  Given that discovery so far was all negative for Sun, he revised his forecast of the settlement value of the case significantly upward:

> [W]e now believe that this matter has a settlement value of $5,000,000.00 to $8,000,000.00, and a potential verdict value of $8,000,000.00 to $12,000,000.00.  This evaluation is, of course, subject to change upon receipt of further information.  ***Moreover, we expect that it will continue to rise as we complete additional discovery***.

ECF No. 43-12, PageID.1232 (emphasis added).

On December 5, 2021, Bell issued an updated report in which he reiterated his view that the claim could settle with $5-$8 million from the Lexington and Allied World policies.  ECF No. 43-13, PageID.1248 (12/5/21 Bell Report).  Bell also reiterated the serious nature of the case and the lack of liability defenses, stating: "Ultimately, this is a case of 100% liability against Sun on 10 out of 10 occasions.  Each step of the way, every witness, every fact, is unfavorable to Sun." *Id.*

7

On February 10, 2022, Bell again revised his settlement and

verdict figures upward and sent an email to Sun's insurers (including

Navigators) and Cooper in which he stated:

> Also, as I indicated to each of you yesterday, my
> evaluation of this case has increased as of
> 12/13/21 and my status report concerning the
> preliminary findings of our conscious pain and
> suffering expert.  Currently, we believe this case
> has a full settlement value of $8-$10 million and
> a potential jury verdict range of $10-$15 million,
> with punitive damages remaining in play.
>
> We will also be preparing an updated jury verdict
> analysis as there are 3 real Plaintiffs in this case,
> actually 4 if you count the young son of the
> Davidson's, not just one.  That is my fault for not
> distinguishing in prior reports.  Let me be clear.
> This is not just an infant drowning case.  We will
> tweak our settlement/jury verdict value
> evaluation once we complete the updated jury
> verdict analysis.

ECF No. 43-14, PageID.1250 (paragraph break added).

On November 9, 2022 (about a month before the December 7, 2022

mediation), Bell told the insurers that he'd spoken with the judge in the

case: "All of our reporting in this case is accurate and consistent with

the Judge's 'thoughts.'"  ECF No. 43-15, PageID.1277 (11/9/22 Bell

email).

8

The parties agree that Bell's projected settlement value never exceeded $10 million in compensatory damages.  ECF No. 43, PageID.1066; ECF No. 48, PageID.1895.  Plaintiff argues, however, that Bell noted several times that his settlement valuations were exclusive of punitive damages.  ECF No. 48, PageID.1895.  Defendant views Bell's projections of settlement value to have been inclusive of all damages, including punitive damages.  ECF No. 49, PageID.1954.  The dispute largely centers on the phrasing in Bell's reports.  *See* ECF No. 43-14, PageID.1250 ("this case has a full settlement value of $8-$10 million and a potential jury verdict range of $10-$15 million, with punitive damages remaining in play").

## C.   Navigators' Review of the Claim

As Sun's second layer excess insurer, Navigators had the right but not the duty to associate with Sun and other insurers in the investigation and defense of the Davidson Lawsuit.  ECF No. 43, PageID.1061 (citing ECF No. 43-6, PageID.1120, Navigators Policy, Section I.1.c.).  Navigators (through its claims personnel like Mr. Hanson) alleges that it exercised its rights by, among other things, actively monitoring the case, promptly reviewing reports provided by

defense counsel Bell, communicating with Sun's other insurers and

Sun's corporate counsel Mark Cooper, and providing input as

appropriate.  *Id.*  For its part, Sun alleges that Navigator's involvement

throughout the case was disinterested and not meaningful.  *See* ECF

No. 48, PageID.1893.  According to Sun, Navigators' first claim handler,

Jerry Mendez, got the file for the Davidson lawsuit in June 2021.  *See*

ECF No. 43-4, PageID.1093.  Bell testified that he found Mendez to be

unresponsive, inexperienced, and in over his head.  *See* ECF No. 43-28,

PageID.1475 (Bell Dep. at 43-8, 18:9-10, 20:12-13, 55:1-12).

Mendez eventually escalated the claim internally, and beginning

in January 2022, Todd Hanson acted as the claim adjuster on behalf of

Navigators.  Mr. Hanson had been a practicing attorney for seven years

and then had over 20 years' experience as a claim adjuster, including

regularly handling wrongful death and other serious claims.  ECF No.

43, PageID.1060.  Upon being assigned the Davidson Lawsuit, Hanson

familiarized himself with the claim by, among other things, reviewing

reports and emails from Bell.  ECF No. 43-9, PageID.1148 (Hanson Dep.

28:5-22).  Thereafter, and throughout the litigation, Hanson continued

to interact and correspond with Bell and the adjusters for Allied World

and Lexington by e-mail and conference calls.  ECF No. 43-10, PageID.1180 (Hanson Claim Notes); ECF No. 43-5, PageID.1101 (Frechette Dep. 17:17-25).  Again, however, Plaintiff disputes the extent to which Hanson was familiar with the case and the extent of his interactions with Bell.  When said about Hanson: "I attempted to engage in a meaningful way with Todd, but Todd just was not engaging in a meaningful way with me."  ECF No. 43-28, PageID.1485 (Bell Dep. at 60:22-24); *see also id.* (59:22-23) ("Navigators . . . was the only carrier that did not interact with me substantively[.]"); *id.* at PageID.1490 (80:17) ("There was no sense of urgency on Todd's part.").

According to Defendant, Hanson evaluated the case and determined that his projected settlement value of the case fell within the Allied World layer, below Navigators' policy.  ECF No. 43-9, PageID.1160 (Hanson Dep. 77:1-6) ("It had a settlement value somewhere plus or minus 8 million, with some potential for a verdict value in excess of that . . .").  Hanson discussed the Davidson Lawsuit, including liability and valuation, with his manager, Caylene Frechette, and Ms. Frechette's manager, Tyler Smith, each of whom had experience adjusting complex claims.  ECF No. 43-5, PageID.1099, 1101

(Frechette Dep. 7:5-6, 16:2-22); ECF No. 43-16, PageID.1284 (Smith

Dep. 6:24-7:10, 10:17).  Frechette testified:

> [W]e always do independent evaluations. Todd
> [Hanson], myself, Tyler [Smith], we all saw the
> case.  I know I personally read the report that
> was prepared prior to the mediation, and I
> discussed it with Todd, and we were in agreement
> based on our own independent knowledge that
> the case was in the eight to $10 million
> settlement range.

ECF No. 43-5, PageID.1102.

Frechette testified that she agreed with all of the reported

settlement evaluations and noted that "I didn't see any other

evaluations from any other parties, including that -- anything from the

insured." *Id.* at PageID.1103 (22:21-23).  Tyler Smith testified:

> When it was escalated, I think we all agreed it
> was a very significant case, a case that was very
> tragic.  There was a lot of sympathy involved, just
> a very bad case.  And we discussed that it was a
> case relating to the unfortunate death of the child
> and we discussed generally the facts of the case,
> both from a damages and liability perspective,
> and then settled on sort of what we plan to do
> with that case . . . .

ECF No. 43-16, PageID.1283 (Smith Dep. 9:22-10:3).

Hanson also engaged separate monitoring counsel, Michael Lynch,

to assist him with monitoring the Davidson Lawsuit and to provide an

independent evaluation and settlement value for the case.  ECF No. 43-9, PageID.1163 (Hanson Dep. 88:1-21); ECF No. 43-17, PageID.1296-97 (Lynch Dep. 16:1-22); ECF No. 43-16, PageID.1284 (Smith Dep. 12:14-16, 17:7-14).  Lynch had extensive experience in insurance defense work, including catastrophic injury cases.  ECF No. 43-17, PageID.1294 (Lynch Dep. 6:4-24; 8:10-21).  Lynch evaluated the case and assessed the settlement value to be in the range of $6 to $7 million.  *Id.* at PageID.1302; ECF No. 43-18, PageID.1313 (Lynch Report).  Plaintiff, however, points out that Lynch's evaluation appeared to be working off Bell's December 5, 2021, report, because Lynch referenced those numbers in his report – but does not appear to refer to Bell's then-current increased settlement and verdict values of $8-$10 million and $10-$15 million respectively (possibly with punitive damages remaining in play).  *See* ECF No. 43-18, PageID.1312-13.  Plaintiff contends that Lynch was either unaware of or ignored Bell's updated numbers and analysis and, consequently, his evaluation was flawed, and Navigators' reliance on his evaluation was improper.  *See* ECF No. 48, PageID.1895.

### D.    Negotiations Prior to Mediation

In 2022, settlement negotiations began between the parties, if at first with numbers meant only to represent opening postures.  On January 17, 2022, the Davidson plaintiffs made an initial settlement demand of $101 million – the entirety of the limits of all of Sun's insurance policies.  ECF No. 43-14, PageID.1261 (1/17/22 Bell email). Lexington, the primary insurer, provided authority to offer its $1 million policy limit on or about March 4, 2022.  ECF No. 43-19, PageID.1316 (3/4/22 B. Costa email).  At that point, Defendant says that Allied World, the first layer excess insurer, through its claim adjuster, Tadzi Jones, then took over control of the settlement negotiations.  ECF No. 43-20, PageID.1348 (3/4/22 T. Jones email). Plaintiff disputes that characterization and says only that Allied World, through Jones, confirmed it had authority to participate in settlement negotiations, but did not "take over" the negotiations.  ECF No. 48, PageID.1895.  The emails suggest that Bell continued to run point on the entire matter, rather than Allied World's adjuster "taking over" the negotiation; in the referenced email chain, with Lexington/AIG's policy limits committed to a settlement, Tadzi Jones was asked if Allied World

14

had authority to "make an effort to avoid trial." ECF No. 43-20,

PageID.1349. Jones responded, "Yes, Allied World has authority to

make an effort to avoid trial." *Id.*, PageID.1348.

On March 17, 2022, Allied World authorized a settlement offer of

$1.5 million on behalf of Sun. ECF No. 43-20, PageID.1344 (3/17/22

Bell email). On April 27, 2022, Bell reported that the Davidson

plaintiffs rejected that offer and countered with a demand of $75

million. ECF No. 43-21, PageID.1379 (4/27/22 Bell email). On May 17,

2022, Allied World authorized a settlement offer of $3 million. ECF No.

43-22, PageID.1417 (5/17/22 Bell email). On July 28, 2022, Bell

reported that the Davidson plaintiffs rejected the $3 million offer and

countered with a demand of $40 million and agreed to attend

mediation. ECF No. 43-23, PageID.1423 (7/28/22 Bell email). At this

point, the parties felt there were enough indications that mediation

would be potentially fruitful. *See id.*

By this point, Bell had been pushing for a sit-down with the

Plaintiffs for some time. *See* ECF No. 43-14, PageID.1261 (1/17/22

email: "Sun remains willing and, in fact, continuing to request we 'sit-

down' at the table directly to discuss settlement . . . I would strongly

15

recommend we try to schedule something for end of February/early March at the latest"); *id.* at PageID.1262 (12/31/21: "I think we want to avoid [April 3, 2022, the anniversary of Emma's death] as well and have it resolved well before then"); ECF No. 43-14, PageID.1272 (9/17/21: "we should be looking to resolve this case by the end of the year [2021]. This is not a case that is going to get any better for us from a liability or damages perspective"); *id.* (Mark Cooper on 9/14/21: "a Fall [2021] mediation was the goal").

On November 9, 2022, at which point the case had been pending for over 16 months, Bell emailed Hanson and the other adjustors to report a call he'd gotten from the presiding judge asking why the case had not settled yet.  ECF No. 43-24, PageID.1430.  The next morning, Bell emailed again, stating that the plaintiffs, Sun, Allied World, and the mediator were all available on December 7, 2022 and that proceeding with the mediation on that date was in Sun's best interests. ECF No. 43-24, PageID.1428.  Hanson indicated that the 7th was not good for him.  ECF No. 43-24, PageID.1427.  Bell said that Allied World and Sun would prefer to proceed that day, to which Hanson responded: "Not a great idea to press this but go ahead if you insist."  ECF No. 43-

24, PageID.1426.  Hanson requested to attend by Zoom, and although there was no "wholesale" Zoom/remote conference capability, the mediator had an iPad and indicated he could set it up for Zoom.  ECF No. 43-25, PageID.1435.  Bell, Jones (for Allied World), and Cooper (counsel for Sun) communicated separately, and Bell and Cooper agreed to proceed without Navigators' in-person presence.  ECF No. 43-26, PageID.1449 (indicating they should move forward with the mediation because it was the "right time" and was "the best course for the potential personal exposure of Sun[.]").  Bell then added "[w]e'll deal with Hartford [Navigators] if everyone else is on boar [sic] and available."  *Id.*

Mediation was scheduled for December 7, 2022 in Philadelphia at the office of the Davidson plaintiffs' attorney.  The mediator was a retired judge who was suggested by the Davidsons to serve as mediator. ECF No. 48, PageID.1897.

Prior to the mediation, Defendant alleges that Hanson discussed the matter with the adjuster for Allied World, Tadzi Jones, and confirmed that Allied World viewed the case as falling within its layer and would likely not reach Navigators' layer.  ECF No. 43-9,

17

PageID.1168 (Hanson Dep. 108:23-109:6). In an email to Bell on the day before mediation, Jones stated his position that he did not plan to offer the Allied World policy limit. ECF No. 43-27, PageID.1456. Bell responded "No worries. While we have a goal internally to get it settled within your policy limits, we'll let the process play out." ECF No. 43-27, PageID.1455. Bell later testified that he believed at the time that such a settlement was not realistic and that he knew going into the mediation that "[Allied World's] policy limits were going to be up[,]" but was essentially acknowledging Jones' position for the time being. ECF No. 43-28, PageID.1496, 105:14-17, 103:22-104:13; *see also id. at* PageID.1485 (indicating he had spoken to Allied World higher-ups, who thought Jones' estimates were low and the Allied World policy would be up "if plaintiffs' attorney is any good").

Defendant claims that neither Bell nor any representative of Sun requested that Navigators have settlement authority available for mediation. ECF No. 43-5, PageID.1101 (Frechette Dep. 16:25-17:3). Plaintiff points out that Navigators was on all of the main reporting email threads, because in their view, there was always a real concern that this case would reach Navigators' level of coverage, as evidenced by

an email from Bell in January 2022 after Plaintiffs' first demand: "given

what we know, I recommend that Lexington [first level] and AWAC

[Allied World] tender their policies up and we negotiate up to those

limits and then work with Jerry [Mendez, at Navigators] to see if the

matter can be resolved.  I also believe given the policy limits demand

that AXA XL, Chubb, and Zurich [excess insurers above Navigators]

should be looped into the reporting at this point."  ECF No. 48-3,

PageID.1925; *see also* ECF No. 43-14, PageID.1265 (12/6/21 email from

Bell: "I suggest a Zoom call this month and we make a run at

settlement meeting next month in Philadelphia . . . Realistically, to get

this matter settled, we believe Lexington, AWAC, and Navigators need

to be on board and prepared to proceed.").[4]

### E.   Mediation on December 7, 2022

Matthew Mahoney, a partner from Attorney Lynch's office,

personally attended the mediation on December 7, 2022 on Navigators'

---

[4] The record also shows an email sent by Bell before the mediation expressing concern that Hartford (Navigators) be ready to have authority, but Hanson was not included on that email and so it is not particularly relevant to what Navigators knew at the time.  ECF No. 43-27, PageID.1456 ("Tadzi [Allied World] - We will have work to do tomorrow, hard work to do, and our team is prepared, but I assume your policy will ultimately get offered?  Reason I ask is that I don't want to lose the momentum if, at end of day, this falls on Hartford and they are not prepared to proceed?").

behalf.  ECF No. 43-25, PageID.1436; ECF No. 43, PageID.1067.  The extent of Mahoney's familiarity with the case and ability to meaningfully contribute to the discussion is contested.  Defendant claims that Lynch discussed the case with Mahoney prior to the mediation and ensured that he was prepared to attend.  *Id.* (citing  ECF No. 43-17, PageID.1305 (Lynch Dep.)).  Plaintiff characterizes Mahoney as a "warm body that was sent to sit in the mediation" and arrived with no money (i.e. unprepared to contribute to the settlement of the claims).  *See* ECF No. 43-28, PageID.1475 (Bell Dep. 21:23-24).  Plaintiff also claims, however, that Mahoney (through Hanson) was in fact authorized for at least $500,000.  ECF No. 43-9, PageID.1144-45 (Hanson Dep. 10:20-11:7, 14:12-19); ECF No. 43-5, PageID.1100-01 (Frechette Dep. 13:23-14:1).

Although Hanson could not attend the mediation in person, he was in regular contact with Mahoney by phone and text throughout the day.  ECF No. 43-29, PageID.1503-05; ECF No. 43, PageID.1067.  Hanson also allegedly spoke with Bell and Allied World's claim adjuster, Tadzi Jones, by phone that day.  ECF No. 43-29,

20

PageID.1505.[5]  While mediation was ultimately successful in resolving

the Davidson's claims, Mahoney and Bell both reported that the

mediator was not effective.  ECF No. 43, PageID.1069 (citing ECF No.

43-29, PageID.1505-07 (Mahoney Declaration) ("the mediator was

completely ineffective and even seemed intimidated by the Davidsons'

attorney . . . Mark Cooper [also] commented that the mediator was not

helpful"); ECF No. 43-28, PageID.1495 (Bell Dep. 99:20-22) ("He was

awful.")).

Going into mediation, the prior offers/demands sat at $3 million

(on behalf of Sun) and $40 million (by the Davidson plaintiffs).  To start,

Allied World made an increased settlement offer on Sun's behalf of $5

million.  ECF No. 43, PageID.1069 (citing ECF No. 43-29, PageID.1506-

07) (Mahoney Declaration).  In response, the Davidsons decreased their

demand to $25 million.  *Id.*  The mediator then suggested that the

parties should agree to a bracket and said the Davidsons would accept a

bracket of $20 million to $25 million.  *Id.*  Allied World (with Sun's

input) responded with a proposed settlement bracket of $6 million to

---

[5] Bell recalls his own conversation with Hanson as happening late in the day, perhaps after the mediation ended.  ECF No. 43-28, PageID.1498 (Bell Dep. 110:9-13).

$11 million. *Id.* At approximately 3:00 p.m., the Davidson plaintiffs rejected the bracket and reduced their settlement demand to the Final Settlement Number,[6] ostensibly on a "take it or leave it" basis, open for that day only.

After some discussion, Cooper, Sun's personal lawyer, asked Allied World's representative to pay its full $10 million policy limit on top of Lexington's $1 million policy and asked Navigators to fulfill its obligations by contributing to a settlement at the Final Settlement Number. ECF No. 48, PageID.1900. Mahoney updated Hanson on this development. ECF No. 43-29, PageID.1508. After some discussion and after initially balking at Sun's ask, Allied World (through its representative Tadzi Jones) agreed to contribute its policy limits. ECF No. 43-29, PageID.1509; ECF No. 43-28, PageID.1497 (Bell Dep. 107) (Jones got on the phone to get approval).

Navigators, however, did not agree to contribute any amount toward the proposed settlement. Navigators alleges this is because,

---

[6] The exact number was redacted by the parties in their public filings and filed under seal. The court uses this placeholder name to refer to the final agreed upon number, and uses the phrase "Final Excess Amount" to refer to the amount of Navigators' excess coverage that would be due under the total Final Settlement Number.

based on every evaluation that had been prepared by Sun's counsel and its own assessment of the case, Navigators believed plaintiffs' settlement demand exceeded the reasonable settlement value by an unacceptable margin, and did not believe there was an immediate need for Sun to settle the case that day.  ECF No. 43, PageID.1070.  At 2:55 p.m., Hanson emailed Jones (Allied World) to say that Navigators opposed the proposed settlement, and requested that Allied World tender its limit to Navigators, rather than tender their limit to Sun. ECF No. 43-30, PageID.1516 (the email also references an alleged phone call between Hanson and Jones, although it is not clear if or when that occurred).  The evidence does not indicate whether Jones saw this email before the mediation concluded.

Mahoney presents another account of the events around 3 p.m.: he says that as Bell, Cooper, and Sun's COO spoke with Jones to ask that Allied World contribute its policy limit to the proposed Final Settlement Number, Bell came over to him (Mahoney) and informed him that Sun planned to "squeeze" Allied World for its policy limit and that, if Navigators did not agree to settle for the Final Settlement Number, Sun was to settle the matter that day and then pursue Navigators to recover

23

the Final Excess Amount.  Bell allegedly told Mahoney that Mark

Cooper (Sun's corporate counsel) and McClaren (Sun's COO) wanted the

matter settled that day.  ECF No. 43-29, PageID.1508-09.

Around this same time, at 3:25 p.m. the excess insurer above

Navigators' layer asked Bell for an update over email.  ECF No. 48-4,

PageID.1930.  Bell responded: "Currently we have a take or leave it

good for today only demand of [Final Settlement Number].  The

Plaintiffs are here.  They are very emotional and sympathetic per the

Judge.  I did meet them this morning.  AWAC [Allied World] is actively

participating.  Hartford [Navigators] is not offering any money."  *Id.*

During this time, Hanson began communicating with Smith and

Frechette about what was happening at the Sun mediation.  ECF No.

43-31, PageID.1518 (chat messages).  A message sent at 4:20 p.m.

indicated Hanson had an email ready to go that "we do not consent" to

the settlement.  *Id.*  Hanson did not ask for authority to contribute to

the settlement.

AXA XL (the next insurance layer) responded to Bell's email

updating the excess insurers at 4:32 p.m. and stated the Final

Settlement Number was reasonable, and therefore that Navigators

should change its position and agree to the proposed settlement:

> Mr. Hanson/Mr. Lynch,
>
> In light of defense counsel's [Bell's]
> communications over the last several months
> outlining the dangers presented in this case, it
> seems that a settlement for the current [Final
> Settlement Number] is reasonable, in-line with
> those communications and should be accepted
> immediately. Defense counsel has stated that
> liability will be adverse, that the Insured had
> prior notice of the lid not being screwed on
> (punitive damages will be sought), has outlined
> the several very significant Portee [negligent
> infliction of emotional distress] claims that will
> be presented, provided a value range up to $15M
> prior to an analysis on her conscious pain and
> suffering and more recently on October 17th sent
> us our Biomechanical expert's opinions where he
> states this matter is "Among the worst cases Ron
> has ever seen in terms of damages. He said the
> body camera evidence, including the mother
> screaming will be difficult to overcome" and while
> he will try to keep the sound out (despite it going
> to conscious pain and suffering), "the video of
> Emma will likely be shown to the Jury." Clearly,
> now with the development of the conscious pain
> and suffering the case value certainly reaches
> [the Final Settlement Number]. As the demand
> is within the Hartford's layer of coverage and is
> consistent with defense counsel's position, AXA
> XL demands that The Hartford [Navigators]
> move to resolve this matter immediately and
> protect its insured. Should such actions not be
> undertaken and this opportunity is lost, AXA XL

> will pursue The Hartford for any sums it is
> obligated to pay due to The Hartford's failure to
> accept the demand.

ECF No. 48-4, PageID.1929.

> The insurer at the next layer of coverage concurred:

> Chubb is in agreement with AXA XL's position
> outlined below and based upon the facts known
> and potential exposure, the demand is reasonable
> and should be accepted.  Chubb formally
> demands that Hanover and AWAC resolve this
> matter and protect our mutual insured's
> interests.  Please be advised that Chubb will take
> any necessary action should Chubb be obligated
> to make payments as a result of Hartford's failure
> to accept the demand.

*Id.*

Navigators, however, indicated to Sun that it would decline to contribute to the settlement.  Hanson spoke by phone to Bell, who then confirmed that Sun intended to use its own funds to settle the case that day and then seek to recover the Final Excess Amount from Navigators later in litigation.  ECF No. 43, PageID.1071.

In an email timestamped 3:47 p.m. (which, according to the record, was 4:47 p.m. Eastern Time),[7] Hanson emailed Bell to formally

---

[7] Hanson was apparently in Chicago while the mediation occurred in Philadelphia.  *See* ECF No. 43-28, PageID.1498; ECF No. 48, PageID.1902.

26

state that Navigators objected to the settlement and to Sun incurring

an obligation to pay under the terms of the settlement.  ECF No. 43-7,

PageID.1136.  Bell alleged that he did not read that email until after

the settlement was reached (though he was aware Navigators was

objecting to making any contribution, and Cooper also received the

email and acted on it).  ECF No. 48, PageID.1902 (citing ECF No. 43-28,

PageID.1498).  According to Hanson in an email to Smith and

Frechette, "after getting your response, the client proceeded to resolve

the matter themselves."  ECF No. 48-4, PageID.1927.

Sun later filed this suit for breach of contract and seeking the

Final Excess Amount from Navigators, plus interest, costs, and fees.

## III.  STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be

granted "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion by: (A) citing to

particular parts of materials in the record . . .; or (B) showing that the

materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). That is, the party opposing a motion for

summary judgment must make an affirmative showing with proper evidence and to do so must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party only needs to demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

## IV.  ANALYSIS

### A.    Relevant law

On Defendant's motion for judgment on the pleadings, the court laid out the relevant law. That order can be found at *Sun Communities, Inc. v. Navigators Ins. Co.*, 782 F. Supp. 3d 558, 560 (E.D. Mich. 2024), and its relevant portions are largely reproduced in this section.

The Navigators Policy incorporates two key clauses that impact Navigators' obligation to Sun for their contribution to the settlement

amount.  The "voluntary payment clause" states: "[n]o Insured will, except at that Insured's own cost, voluntarily make a payment, assume any obligation or incur any expense, other than for first aid, without our consent."  ECF No. 17-4, PageID.333 (Allied Policy) (emphasis in original).  The "no action clause" states: "[n]o person or organization has a right . . . to sue us under this policy unless all of its terms have been fully complied with."  *Id.* at PageID.334.  Under the plain language of these clauses, Sun can only receive compensation if: (a) Navigators consented to the payment; and (b) Sun's liability was fixed by way of an entry of a final judgment or a settlement agreement signed by Navigators, Sun, and the claimant.

It is not contested that Sun entered into a settlement agreement in the Davidson Lawsuit without obtaining Navigators' express consent. While they participated in the private mediation, it is also not contested that Navigators was not a party to the final settlement agreement.  As such, Sun would ordinarily not be entitled to recover the settlement amount under the plain language of the Navigators Policy.  However, Sun raises a different claim: Navigators breached the underlying contract by acting in bad faith and "failing and refusing to meaningfully

30

or reasonably participate in the mediation, meaningfully or reasonably

evaluate the plaintiffs' settlement offers and/or contribute to

settlement."  ECF No. 1, PageID.6.

Under Michigan law, "the covenant of good faith and fair dealing

is an implied promise contained in every contract 'that neither party

shall do anything which will have the effect of destroying or injuring the

right of the other party to receive the fruits of the contract.'"  *Rodgers v.*

*JPMorgan Chase Bank NA*, 315 Mich. App. 301, 310-11 (2016).

Michigan does not recognize an independent cause of action for a breach

of the covenant, or duty, of good faith and fair dealing, but it may form

the basis of a claim for breach of contract.  *See Belle Isle Grill Corp. v.*

*Detroit*, 256 Mich. App. 463, 476 (2003); *Gorman v. American Honda*

*Motor Co., Inc.*, 302 Mich. App. 113, 133 (2013) ("The obligation of good

faith is not an independent duty, but rather a modifier that requires a

subject to modify.  It is a principle by which contractual obligations ...

are to be measured and judged.").  A breach of contract claim based on

the duty of good faith and fair dealing must include "some underlying

contractual term to which the duty can apply."  *Gorman*, 302 Mich. App.

at 134.  Courts apply this duty especially where a party makes its

performance of that contractual term "a matter of its own discretion."
*Burkhardt v. City Nat. Bank of Detroit*, 57 Mich. App. 649, 652 (1975);
*Ferrell v. Vic Tanny Int'l, Inc.*, 137 Mich. App. 238, 243 (1984) ("Where a
party to a contract makes the manner of its performance a matter of its
own discretion, the law does not hesitate to imply the proviso that such
discretion be exercised honestly and in good faith.").

Michigan courts have previously applied the covenant of good
faith and fair dealing to insurance contracts and have found that
insurers generally have an implied contractual duty to act in good faith
when investigating an insurance claim and when negotiating a
settlement.  *Auman v. Fed. Ins. Co.*, 81 Mich. App. 740, 742 (1978) ("An
insurance company in negotiating settlements has a duty to act in good
faith with respect to the interest of the insured, and if it fails so to act,
the insured may bring an action for the damages he suffers as a
result.") (citing *City of Wakefield v. Globe Indem. Co.*, 246 Mich. 645,
650 (1929) ("The power to control settlements having been granted to
insurer for the purpose of its own protection under the policy, it is
bound to use the power in good faith for that purpose.")); *see also*
*Liimatta v. Lukkari*, 185 Mich. App. 144, 146 (1990) ("The duty to use

good faith in attempting to settle a claim runs . . . to the insured");
*Tibble v. Am. Physicians Cap., Inc.*, No. 306964, 2014 WL 5462573, at
*6 (Mich. Ct. App. Oct. 28, 2014) ("An insured may sue its insurer for
acting in bad faith in refusing to settle.") (citations omitted).  This duty
to negotiate settlements in good faith arises once a lawsuit is filed
against the insured.  *See Trident Fasteners, Inc. v. Selective Ins. Co. of
S.C.*, No. 21-1439, 2022 WL 3088238, at *5 (6th Cir. 2022) ("The duty to
negotiate settlements likewise requires a lawsuit before a duty to act in
good faith arises.").  It is generally not considered "bad faith" for an
insurer to refuse a settlement based on an honest error in judgment, a
belief that they might defeat the action or keep the verdict within policy
limits, an opinion that the settlement amount is excessive, or if there
are legal defenses that have not yet been raised.  *See City of Wakefield*,
246 Mich. at 652-53; *Com. Union Ins. Co. v. Liberty Mut. Ins. Co.*, 426
Mich. 127 (1986).  "Bad faith" is defined as "arbitrary, reckless,
indifferent, or intentional disregard of the interests of the person owed
a duty."  *Commercial Union Ins. Co.*, 426 Mich. at 136.  Under that
standard, bad faith may be found where there is a "failure to accept a
reasonable compromise offer of settlement when the facts of the case or

claim indicate obvious liability and serious injury," a "rejection of a reasonable offer of settlement within the policy limits," "undue delay in accepting a reasonable offer to settle a potentially dangerous case within the policy limits where the verdict potential is high," a "failure to make a proper investigation of the claim prior to refusing an offer of settlement within the policy limits," "disregarding the advice or recommendations of an adjuster or attorney," or "serious and recurrent negligence." *Id.* at 138-39.  The conduct under scrutiny must be viewed in the broader context of the case and "must be considered in light of the circumstances existing at the time" of the settlement negotiations, not using "20-20 hindsight vision." *Id.* at 139.  "If the insurer is motivated by selfish purpose or by a desire to protect its own interests at the expense of its insured's interest, bad faith exists, even though the insurer's actions were not actually dishonest or fraudulent." *Id.* at 137.

This court has also already found that the binding settlement agreement entered into by Sun did not alter Navigators' "duty to participate in the underlying settlement process in good faith." *Sun Communities, Inc. v. Navigators Ins. Co.*, 782 F. Supp. 3d 558, 565 (E.D. Mich. 2024).

**B.     Factual findings**

For the reasons explained below, a reasonable jury could find that Navigators breached its duty to act in good faith with respect to the interest of its insured.

### i.     Obvious Liability and Serious Injury

Defendant, to their credit, does not dispute the tragedy of the Emma Davidson's death, and includes in their motion what appears to be all relevant records of the underlying suit.  But although the details are unpleasant to recount, it is worth keeping in mind exactly why Sun Communities valued this case so highly and why they reasonably sought to settle the matter sooner rather than later – underlying facts that a reasonable jury could also rely on in assessing Navigators' conduct by finding that the "facts of the case indicated obvious liability and serious injury."  *Com. Union Ins. Co.*, 426 Mich. at 138-39.

The record presented by Navigators includes detailed reports by Jeff Bell that reference witness interviews, body cam footage from first responders, investigative findings, and autopsy results, all of which were in Navigators' possession.  *See id.*  As explained in detail in those reports, the circumstances of the little girl's death were horrific.  Three-

year-old Emma Davidson went missing while playing with other children near her family's campsite at an RV campground. *See* ECF No. 43-13, PageID.1244; ECF No. 43-12, PageID.1217. Her family was there with friends to celebrate a wedding. *Id.* at PageID.1216. When the adults around the campfire realized Emma was missing (approximately 10 minutes after she was last seen), they fanned out to search for her. She was found alone, headfirst in a septic tank filled with sewage and fecal matter approximately 10 feet deep, when a searcher spotted her shoes and a portion of her dress. As Bell's report to Navigators summarized the event: "three-year old Emma Davidson fell into the septic tank, and struggled to stay afloat, and drowned in human excrement." ECF No. 43-12, PageID.1231. She was pulled out, unresponsive, by her mother who had jumped into the tank to get her. Her father lifted her out of her mother's arms and onto the ground. The autopsy was inconclusive as to how much Emma could see, hear, or feel at the time she was pulled from the tank, but she may have been alive for about an hour more before she was declared dead. "[G]iven the circumstances as to how and where she drowned," Bell's report anticipated "that a jury will put a high valuation on this case for her

pain and suffering, almost irrespective of the actual amount of time she remained conscious." ECF No. 43-12, PageID.1231.[8] Summaries of body cam footage, which would likely have been shown to a jury, reference audio of Emma's mother screaming and retching in the background as bystanders and first responders performed CPR unsuccessfully. "The bodycam video shows both Mr. and Mrs. Davidson covered in waste, crying and shouting." ECF No. 43-12, PageID.1232. Graphic and disturbing screenshots taken from that footage appear in the reports given to the insurers, and show Emma lying on the ground, unresponsive and covered in sewage.

Damages in the Davidson lawsuit were, plainly, expected to be substantial, and likely inflated well above the value of other drowning cases because of the unique circumstances of the case. *See id.* Beyond the economic damages for Emma alone (assessed at roughly $1.0-1.7 million, ECF No. 43-27, PageID.1459), the defendants in the Davidson Lawsuit were expecting significant pain and suffering damages

---

[8] Again, caution to readers, but illustrative of the potential damages evidence that would have gone before a jury: the reports and depositions reference autopsy photos showing fecal matter in her "eyes, mouth, and ears." ECF No. 43-13, PageID.1236.

representing the time that she was alive after she fell into the tank. *Id.*
at PageID.1231.

For her parents, negligent infliction of emotional distress claims
were assessed to be viable, and would have stacked damages on top of
Emma's wrongful death and survivorship claims. *Id.* (NIED claims
(referred to as a *Portee* claim)[9] judged to have been bolstered by facts
revealed in discovery); ECF No. 43-11, PageID.1201 (assessed from the
start as viable). There was also discussion of damages for a *Portee*
claim for Emma's older brother, who was present that night playing
with the other children, and may have been among the last people to
see Emma. *See* ECF No. 43-9, PageID.1151 (brother also had a claim);
ECF No. 43-33, PageID.1546 (final settlement included claims on behalf
of the brother). The record at times reflects some confusion as to
whether those amounts for the *Portee* claims were incorporated into
Bell's estimates or were still forthcoming, but Plaintiff's counsel
indicated at oral argument that he read Bell's estimates to be inclusive
of the *Portee* claims, and the court treats that as a concession for
purposes of summary judgment and this opinion only. *But see* ECF No.

---

[9] *See Portee v. Jaffee*, 84 N.J. 88, 101 (1980).

43-28, PageID.1490 (Bell Dep. 81:4-9) (indicating the $8-10 million may have not included the parents' claims); ECF No. 43-14, PageID.1250 ("We will also be preparing an updated jury verdict analysis as there are 3 real Plaintiffs in this case, actually 4 if you count the young son of the Davidson's, not just one. That is my fault for not distinguishing in prior reports. Let me be clear. This is not just an infant drowning case. We will tweak our settlement/jury verdict value evaluation once we complete the updated jury verdict analysis.").

### ii.    Punitive Damages

Importantly, punitive damages were also expected under New Jersey's Survivorship Act. *See* ECF No. 43-9, PageID.1151. To establish liability on this point, plaintiffs needed to establish a "wrongful act, neglect, or default" by Sun and that its conduct was "wantonly reckless or malicious." *See Smith v. Whitaker*, 160 N.J. 221, 241 (1999) (citations omitted); *id.* at 256-57 (it is a plaintiff's burden "to prove by clear and convincing evidence that defendant's conduct amounted to a 'deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to the consequences.'") (citation omitted). Recovery for conscious pain and

suffering under the Survivorship Act is permissible "whenever it can be shown the injured person survived her injuries, however briefly." *Id.* at 236.

The evidence on this "reckless indifference" standard was not looking good for Sun, either for liability or damages. Though Sun intended to file a motion for summary judgment on punitive damages, they anticipated losing that motion and facing a jury on that issue too. *See* ECF No. 43-23, PageID.1423 ("At this juncture, we believe such a Motion will be denied . . . ."). In Bell's words: "Each step of the way, every witness, every fact, is unfavorable to Sun." ECF No. 43-13, PageID.1248.

Emma apparently fell through an unsecured septic riser lid. A septic riser is a circular opening that creates ground-level access to a below-ground septic tank. The proper standard of care is to secure any lids on septic risers with screws or bolts to prevent access by children. ECF No. 43-23, PageID.1422. At this Sun property, campground staff use a vehicle called a "honey wagon" to pump out the waste from the RVs into the septic risers on a regular basis. The "honey wagon" has a 300-gallon capacity and when it is full, staff open the septic tank lid

40

near one of the leach fields and empty the contents into the septic tank so that it can leach into the adjoining field.  ECF No. 43-11, PageID.1191.  The septic tank at issue had a riser and plastic cover but did not have an interior safety lid.  The plastic covers, which weigh similarly to the lid of a plastic outdoor trashcan, have screws available for securing them to the riser.

In this case there was no fencing, cones, or signage preventing people from accessing the area of the septic risers.  ECF No. 43-12, PageID.1218.  A New Jersey Department of Environmental Protection inspection in April 2021, a few days after Emma's death, "observed that numerous [septic] tank lids were improperly maintained, including plastic lids that were not fastened as intended (not locked in place) and concrete lids that were cracked."  *Id.* at PageID.1220.  "[T]here were also multiple violations for failing to maintain written records of septic tank inspections and pumping events.  Plaintiff also provided inspection summaries predating this accident, which evidence non-compliance and violations of record-keeping requirements in August 2016."  *Id.*  There was a prior complaint about a child almost falling into, apparently, these *same* unsecured lids on the same property, which was documented

41

by a witness and deemed credible by Sun.  ECF No. 43-13, PageID.1247.

Yet even so, a Sun property manager earlier that day had seen children

playing in that area but issued no warning to stay off the septic risers

and lids.  ECF No. 43-12, PageID.1219; *id.* at PageID.1227 ("it appears

that maintenance workers and even the property manager, Mr. Randle

witnessed a small group of children playing in the area of the lids

throughout the day, specifically playing on the covers.").  And on the

day of the incident in this case, a witness "observed Sun's employees

dumping into the tanks multiple times on the date of the accident and

not properly seating [replacing] the lids afterwards."  ECF No. 43-13,

PageID.1247.  As to this particular lid, Sun's "maintenance employees

indicated that this particular lid has *never* been screwed in place and

they did not screw it in place after each use on the day of the incident."

ECF No. 43-12, PageID.1227 (emphasis added).  An officer on the scene

later inspected "the sewer lid and compared it to a 'Trashcan lid, like a

light piece of plastic[ ... ] even a three year-old could have picked it up

and threw it off.'"  ECF No. 43-12, PageID.1223.  It was assumed, based

simply on casual testing of how the lid moved with weight on it, that

Emma stepped or jumped on the lid at a bad angle and the unsecured lid flipped open. *Id.*

Bell's report concluded, "we believe that Plaintiffs will use these prior instances to establish that the Insureds had notice that that the plastic septic tank covers were insufficient in preventing guest from falling into the septic tanks."  ECF No. 43-12, PageID.1227.  The report also concluded "that the Insureds should have used other, commercially-available, safety devices with the septic lids such as: locking caps; restrictors that reduce the size of the hole to just the size of the discharge hole; inserts that narrow the size of the pipe; heavy concrete slabs which cover the hole; or safety webbing that sits in the whole to prevent fall-ins.  The Insureds could have simply put fencing with a gate around the access points, as they have after the incident.  These options were all commercially feasible when the system was installed."  *Id.* at PageID.1228.

The evidence on the issue of Sun's notice of these issues was expected to only get worse.  "We anticipate that Plaintiffs will seek to depose Regional Vice Presidents and General Managers, and will inquire about the prior incidents in an effort to bolster their liability

arguments and punitive damage arguments.  As previously mentioned, we are virtually certain those depositions are not going to go well for our defense.  Simply put, it is our believe [sic] that the front line employees did not appreciate the risk of their actions leaving the lids unsecured."  ECF No. 43-23, PageID.1423.

As noted, the other important part of punitive damages in this action was the compensatory recovery for the pain and suffering Emma experienced before her death.  ECF No. 43-11, PageID.1200 (Bell to the insurers: "***This will be a critical issue in this matter.***") (emphasis in original).  An updated analysis was provided in an email from Bell in December 2021 and in October 2022 (ECF No. 43-15, PageID.1278), and it was at least clear that significant conscious pain and suffering damages were at issue and were likely to be assessed, and any amount of damages in that regard would be multiplied in a punitive damages award.  *See* ECF No. 43-14, PageID.1263.

### iii.   Evidence of Navigators' Bad Faith

A jury could consider many different facts to conclude that, in the totality of the circumstances, Navigators acted in bad faith.

First, a jury could easily find that Navigators was on notice that a reasonable settlement value of the case was within their layer, as Bell had explicitly so indicated on several occasions. *See, e.g.*, ECF No. 48-3, PageID.1925 (Bell in January 2022: "given what we know, I recommend that Lexington [first level] and AWAC [Allied World] tender their policies up and we negotiate up to those limits and then work with Jerry [Mendez, at Navigators] to see if the matter can be resolved."); ECF No. 43-14, PageID.1265 (email from Bell on December 6, 2021: "Realistically, to get this matter settled, we believe Lexington, AWAC, and Navigators need to be on board and prepared to proceed.").

Second, Navigators' witnesses at several times asserted that punitive damages were not at issue in this case. In one relevant email sent the next day, Hanson told Smith: "the amended complaint did seek punitive damages although neither Mike nor defense counsel evaluated the case as having punitive exposure." ECF No. 48-4, PageID.1927; ECF No. 43-9, PageID.1158 (Hanson Dep. 66:6-7) ("I think it was an unlikely punitive exposure."); *id.* at 1156 (61:17) "It was never evaluated as a punitive damages case."). As Plaintiffs point out, that purported analysis was inconsistent with pretty much every report from

45

Bell; Bell's updates and reports clearly indicated punitive damage

exposure, and these statements are therefore evidence that Navigators

did not make a proper investigation of the claim prior to refusing the

Final Settlement Amount.  As of February 2022, Bell's evaluation of the

case had increased from his original estimates, and he indicated the

case "has a full settlement value of $8-$10 million and a potential jury

verdict range of $10-$15 million, with punitive damages remaining in

play."  ECF No. 43-14, PageID.1250.  Bell reported the plaintiffs' focus

on punitive damages in several different communications at different

times.  *See, e.g.,* ECF No. 43-13, PageID.1248; ECF No. 43-14,

PageID.1250; ECF No. 43-21, PageID.1389; ECF No. 43-14,

PageID.1260 (indicating the insured, through counsel Cooper, was

concerned about "the potential exposure for punitive damages"); ECF

No. 43-28, PageID.1490 (Bell Dep. 47:2-3) ("Punitive damages were part

of this litigation."); ECF No. 43-27, PageID.1463 (email in November

2022: indicating "punitive damages are the driving force" in settling the

case).  While Plaintiff and Defendant dispute whether Bell's estimates

were inclusive or exclusive of punitive damages, a reasonable jury could

interpret Bell's estimates to exclude punitive damages and to indicate

that actual settlement values were much higher, and therefore that a

reasonable settlement value was within Navigators' layer. And a jury

could, in making that determination of which interpretation of Bell's

estimates to credit, consider that Navigators incorrectly stated on

several occasions that punitive damages were not at issue.[10]

Navigators also argues, albeit in a single sentence in their reply

brief, that "punitive damages were generally not insurable, and thus

they fell outside of the insurers' settlement obligations."  ECF No. 49,

PageID.1954 (citing ECF No. 43-32, PageID.1526 (McLaren Dep. 21:19-

21:21)).  Even accepting, however, that punitive damages were not

insurable as damages after trial, there is plenty of evidence suggesting

---

[10] For example, in the sentence in Bell's report that the case "has a full
settlement value of $8-$10 million and a potential jury verdict range of $10-$15
million, with punitive damages remaining in play," does the first comma separate
the "full settlement value" from a "potential jury verdict range plus punitive
damages," or do both commas separate three separate values: a "settlement value",
a "verdict range", and "punitive damages remaining in play" as to each, or are
punitive damages meant to be priced into both estimates?  A jury could read it any
of those ways.  And while that ambiguity could suggest an innocent or merely
negligent misreading and support Navigators' argument, in the light most favorable
to Plaintiff and in light of the context of Bell's other communications regarding
punitive damages, any misreading could instead be taken as evidence of Navigators'
indifference, serious and recurrent negligence, or failure to properly investigate the
claim.  *See Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*, 426 Mich. 127, 135
(1986) ("bad faith by an insurance company for a breach of a duty to settle is
something more than negligence") (citation omitted, cleaned up); *but see id.* at 138-
39 ("serious and recurrent negligence" is indicative of bad faith).

that the insurers considered it relevant to their evaluation and that consideration would be part of any settlement structure. *See* ECF No. 43-11, PageID.1200 (Bell report in July 2021 deeming punitive damages under Survivorship Act, which depend on conscious pain and suffering damages, a "critical issue in this matter"); *but see* ECF No. 43-9, PageID.1158 (Hanson Dep. 66:6-7) ("I think it was an unlikely punitive exposure."); *id.* at 1156 (61:17) "It was never evaluated as a punitive damages case."). A jury could find bad faith in Navigators' failure to agree to a reasonable offer where the potential verdict (including punitive damages) was high, and could consider evidence that Navigators did not recognize the significant punitive exposure for their insured (regardless of whether that exposure was eventually insurable) as failure to make a proper investigation of the claim. *See Com. Union Ins. Co.*, 426 Mich. at 138-39.

Third, a jury could find that Navigators failed to keep track of the current reported compensatory value of the claim, independent of punitive exposure. Hanson prepared a Large Loss Report after the mediation (the "LLR", ECF No. 48-5, PageID.1942-46), dated December 20, 2022, summarizing the Davidson matter. The LLR misstates and

underestimates Bell's pre-mediation settlement and verdict values by several million dollars.  It states that "[p]rior to mediation, defense counsel retained by the primary insurer evaluated PEV at $8 to $12 million and settlement value at $5 to $8 Million."  *Id.* at PageID.1945. It later states "[w]e advised the insured that the demand of [the Settlement Amount] was not reasonable and well above the settlement evaluation of $5M-8M."  *Id.*  Bell, however, had increased his settlement and verdict values to, respectively, $8-$10 million and $10-$15 million, as of February, 2022.  Recall, too, that in the light most favorable to Plaintiff, Navigators did not give Bell's updated numbers to Mike Lynch either, and their reliance on Lynch's report also undercounted the value of the claim by millions of dollars.  *See* ECF No. 48, PageID.1895.  A jury could consider these repeated misstatements of Bell's estimates evidence of a failure to make a proper investigation of the claim, disregard of the advice or recommendations of the lead attorney on the case, or serious and recurrent negligence.

In any case, neither Bell's estimates nor Navigators' internal estimates are preclusive evidence of reasonable settlement value. While they are highly relevant evidence and a jury could credit

49

Navigators' explanation, a reasonable jury could also assess that a predicted "settlement value range" is not conclusive evidence as to the reasonableness of Navigators' position that they would not contribute, given all the evidence available to them about what it would take to settle the Davidsons' claim.  During initial settlement negotiations prior to mediation, Bell concluded that the Davidson Plaintiffs were likely "looking for between $20 to $30 million to resolve this claim[,]" which a reasonable jury could conclude was sufficient to put Navigators on notice that some amount of its policy layer would be needed to resolve the case, regardless of the ballpark "estimated" values given.  *See* ECF No. 43-14, PageID.1260.  After the plaintiffs' $40 million demand, Bell emailed: "based on Plaintiff's willingness to proceed to Mediation, we should schedule a conference call with Lexington (defense costs above SIR), and AWAC, Navigators, and XL as they are the carriers whose limits may be included within the current $40 million demand."  ECF No. 43-23, PageID.1424.  Bell also had indicated that his estimates, last formally updated in February 2022, would "continue to rise" as more depositions were taken, although, granted, he never updated his estimated numbers again.  ECF No. 43-12, PageID.1232.  His email

with Hanson in May 2022 indicated (in the light most favorable to

Plaintiffs) that depositions indeed continued throughout the summer of

2022 before the mediation.  ECF No. 43-22, PageID.1417.

Relevant too, are the positions taken by the two insurers above

Navigators' layer.  When notified of the plaintiffs' take-it-or-leave-it

demand, XL said that the Final Settlement Number was "reasonable"

and "in-line with" Bell's communications to the insurers.  ECF No. 48-4,

PageID.1929; *id.* (Chubb (the insurer excess of XL): "the demand is

reasonable").  The positions they took are perhaps self-serving, but at

this stage and in the light most favorable to Plaintiffs, they are

admissible evidence that Navigators' unwillingness to agree to the Final

Settlement Number was a breach of good faith and fair dealing, and

was an unreasonable position as compared to the analysis of similarly

situated insurers.  The emails from those insurers also are evidence

that the other insurers understood Bell's most recent estimates of the

settlement value of the case in December 2021/February 2022 to have

been partially overridden by more recent developments "of the conscious

pain and suffering" analysis, which increased the value of the case.

ECF No. 48-4, PageID.1929 ("Clearly, now with the development of the

conscious pain and suffering the case value certainly reaches [the Final Settlement Number]").  In the light most favorable to Plaintiff, both of those emails are evidence that Navigators rejected "a reasonable offer of settlement within the policy limits" and "failed to make a proper investigation of the claim." *Com. Union Ins. Co.*, 426 Mich. at 138-39.[11]

A jury could also note that, although Navigators apparently took the position that they had no money at the mediation, testimony taken in the light most favorable to Plaintiff indicates that was not entirely true.  Hanson (through Mahoney) apparently had authority for at least $500,000, which was not offered.  *See* ECF No. 43-9, PageID.1144-45 (Hanson Dep. 10:20-11:7, 14:12-19); ECF No. 43-5, PageID.1100-01 (Frechette Dep. 13:23-14:1); ECF No. 43-16, PageID.1284 (Smith Dep. 10:5-10:17); *but see* ECF No. 43-17, PageID.1305 (Lynch Dep. 53:24) ("I do not believe that Mr. Mahoney had authority.").  Instead, Mahoney's position was "I don't have any money."  ECF No. 43-28, PageID.1497

---

[11] Navigators disputes that these insurers' mention of conscious pain and suffering damages was an accurate reading of Bell's updates (essentially: that conscious pain and suffering was already "priced in" to Bell's latest valuation), but the fact remains that those two insurers took that stance at that time, and their statements are evidence of the insurers' contemporary understanding of the case's value.  The weight and credibility to assign to that evidence are for a jury to evaluate.

(Bell Dep. 108:22).  Their unwillingness to offer even that amount and pause negotiations while they sought further approval could be considered evidence of bad faith.  A jury could also find that Mahoney and Hanson were on notice that day about the likelihood of settlement reaching into Navigators' layer, and should have been actively communicating with Hanson's supervisors to get the necessary authority.  *Compare* ECF No. 43-28, PageID.1495 (Bell Dep. 100:22-24) (the mediator "eventually came downstairs and said 'This doesn't settle for anything with -- without a 2 in front of it.'"), *with* ECF No. 43-31, PageID.1518 (chat messages advising that Hanson had an email ready to go that "we do not consent" to the Final Settlement Amount and not seeking further authority from his supervisors).

As far as Defendant argues that Sun chose this course of action, and they (Navigators) were not required to go along with it, the court has already addressed this argument.  *See* ECF No. 17, PageID.228 ("Sun had other choices, not least of which would have been to refuse to pay its own money to satisfy the underlying plaintiffs' demand at mediation and instead allow Navigators the opportunity to undertake continued negotiations with the underlying plaintiffs.").  As stated

53

previously, "[w]hile it may be true that Sun had other options, as is almost always true in the course of legal proceedings, the mere existence of these other options did not excuse Navigators from their duty under Michigan law to participate in settlement discussions in good faith." *Sun Communities, Inc. v. Navigators Ins. Co.*, 782 F. Supp. 3d 558, 565 (E.D. Mich. 2024). Sun was, it admits, concerned about negative media attention and reputational harm resulting from the Davidson Lawsuit, which contributed to their desire to see the lawsuit settled more quickly. But as far as Navigators downplays its Insured's interest and, in the light most favorable to Plaintiffs, put its own monetary interest before Sun's interests, the Michigan Supreme Court has said that "[i]f the insurer is motivated . . . by a desire to protect its own interests at the expense of its insured's interest, bad faith exists, even though the insurer's actions were not actually dishonest or fraudulent." *Commercial Union Ins. Co. v. Liberty Mutual Ins. Co.*, 393 N.W.2d 161, 164 (Mich. 1986); *see also* ECF No. 43-11, PageID.1194 (Bell's initial report, citing media attention on the case). A reasonable jury could find that Navigators was motivated by a desire to protect its

own interest at the expense of its insured, and therefore that bad faith exists.

Finally, although Navigators argues that they were not allowed to "take control of the settlement negotiations" (ECF No. 49, PageID.1953) a reasonable jury could choose not to credit that characterization of the relevant events. Specifically, Navigators says they "sought to take control of the settlement negotiations by asking Allied World to tender its limit to Navigators. Allied World refused, apparently at Sun's behest." ECF No. 49, PageID.1953. In their view, it was then that "Navigators was deprived of the opportunity to continue negotiating." *Id.* at PageID.1948. And indeed, in the light most favorable to Navigators, some evidence suggests that they intended to try and take over settlement negotiations late in the day of mediation but were not able to do so, and that would likely be evidence of a lack of bad faith. ECF No. 43-30, PageID.1516 (email at 2:55 p.m. from Hanson to Jones [Allied World]); ECF No. 43-31, PageID.1518 (chat message at 4:20 p.m. indicating Allied World did not tender their limit to Navigators). But in the light most favorable to Plaintiffs, the evidence asserting that Sun controlled Allied World or in some way forced them to refuse to tender

55

their limit to Navigators is inconclusive.  The evidence that Navigators

even properly made such a demand to Allied World to tender their limit

to Navigators is also inconclusive; Navigators had, after all, a

representative in the room and did not appear to make the demand in

person.  There is no conclusive record of a phone call between Hanson

and Jones formally and explicitly making that demand.  *But see* ECF

No. 43-30, PageID.1516 (Hanson to Jones over email: "Confirming our

last conversation, Navigators does not support a tender of the AWAC

insurance limits to plaintiff . . . If AWAC is inclined to tender policy

limits, please tender them to Navigators."); *id.* at PageID.1169 (113:12-

13) (alleging he told Jones "You can tender them to me if you want,

Tadzi.").  Although Hanson sent Jones an email asking for Allied World

to tender its limits, there is no evidence that Jones or anyone from

Allied World read the relevant email from Navigators formally making

the demand prior to the end of mediation, or that Sun was made aware

of that demand.  There is no evidence indicating Navigators took any

other steps to follow up on that email, such as having Mahoney step in

to try and "press pause" in the room and assert Navigators' rights, or

suggest an adjournment while Navigators took over.  In the room,

Navigators allegedly took the position that they did not "have any money." *See* ECF No. 43-28, PageID.1497 (Bell Dep. 108:18-22) (Q: what was the request of Hartford? A: The request was Tadzi's money is now up. Hartford it's your turn. Q: What was the response? A: "I don't have any money."). For that matter, there is no evidence that despite the risk to Navigators' layer throughout the 16 months preceding the mediation, Navigators ever took any steps to ask Allied World to tender its limits prior to 3 p.m. on the day of mediation. *See* ECF No. 43-28, PageID.1490 (Bell Dep. 80:12-13); ECF No. 48-3, PageID.1925 (Bell in January 2022, giving Navigators an explicit opportunity to "take over" the negotiation: "given what we know, I recommend that Lexington [first level] and AWAC [Allied World] tender their policies up and we negotiate up to those limits and then work with Jerry [Mendez, at Navigators] to see if the matter can be resolved."). Plaintiffs argue, with merit, that there is at least a minimum quantum of "evidence from which a jury could find that Navigators had the right and ability to take

control of the negotiations, but simply chose not to."  ECF No. 48, PageID.1909.[12]

There also is little evidence that Navigators ever intended to offer anything more even if they had "taken over" negotiations, because they continue to assert that they valued the case within the Allied World layer, and because they did not even offer the $500,000 of authority they had that day.  As far as Navigators argues that it was "appropriately prepared" for mediation because they evaluated the case as falling within Allied World's layer (ECF No. 49, PageID.1951) (i.e. that they were appropriately prepared for mediation by being prepared to offer no contribution based on their assessment of the case), that ignores the possibility that a jury could simply disagree and find that the Final Settlement Number was a reasonable offer of settlement in a

---

[12] The court assumes that Defendant is correct that, generally speaking, breach of good faith and fair dealing cases do not arise in this posture, because in the run of cases the insurer refuses to settle, the case goes to trial, and the insurer is liable for the excess above the reasonable settlement offer.  The court is not convinced that means that this posture is improper as a matter of law; as this court already found, the fact that Sun could have opted to go to trial and sue Navigators for the excess "did not excuse Navigators from their duty under Michigan law to participate in settlement discussions in good faith."  *Sun Communities, Inc. v. Navigators Ins. Co.*, 782 F. Supp. 3d 558, 565 (E.D. Mich. 2024).

case with obvious liability for serious injuries and with a large risk of a high jury verdict.

Certainly, events appear to have moved fairly quickly at the end of the day at mediation. But in the light most favorable to Plaintiffs, Navigators was on notice that negotiations might reach their layer, and regardless of whether they hoped to continue negotiations on another day, their unpreparedness on the day of mediation to offer any money at all towards settlement is evidence that a jury could find represents a failure to seriously consider their Insured's interests in a timely settlement[13] and its potential exposure to a high jury verdict, a failure to properly investigate the claim, and undue delay in accepting a reasonable offer of settlement at the time it was offered.

Plaintiff's case is far from airtight, and Defendant's counsel ably poked holes in their case throughout oral argument. The court has viewed unfavorably, as it must at summary judgment, the importance

---

[13] Defense counsel indicated that bad press and loss of goodwill as damages are not covered by their insurance policy. However, counsel conceded that it is fair for the insurer to take into account the totality of the claim. Bell was reporting, after all, on the bad press for Sun from the beginning, and that concern was baked into every evaluation he gave and was relevant to the insurer's consideration of their insured's interests. *See* ECF No. 43-11, PageID.1194 (initial report referencing media attention on the case).

59

of the allegedly sudden increase from the last suggested bracket of $6-11 million to the Final Settlement Number, which a jury could weigh in Navigators' favor.  The court has viewed in the light most favorable to Plaintiff the weight and credibility of evidence suggesting that Sun did not effectively or clearly communicate the total anticipated settlement exposure in Bell's reports.  It has viewed unfavorably the importance of evidence that Sun privately went into the mediation with its own "unlimited" settlement authority.  *See* ECF No. 43-32, PageID.1535 (McLaren Dep. 55:15-17).  It has viewed unfavorably the arguments that Sun selected a date that Navigators' primary representative was not available in person, that they failed to communicate with Navigators about their intentions, and that they intentionally withheld that plan from Navigators and anticipated bringing this very lawsuit if Navigators did not concede to their plan.  Such a plan to wrest control of negotiations from the insurers, if true, would show that Navigators was effectively ambushed with an unreasonable demand for contribution by their insured, and that when Navigators tried to take control of negotiations, as was its right, Sun prevented them from doing so in order to reach a settlement on their own.  This plan would also tend to

suggest that Sun is, in its litigation posture in this case and on this motion, not being entirely forthright.

However, in the light most favorable to Plaintiff, a reasonable jury presented with this claim and the history of the underlying dispute could assess that an insurer unwilling to pay out any of their excess coverage, even within the time period available at mediation, was in bad faith not giving the benefit of the bargain to their insured given their longstanding notice of the claim and opportunity to appropriately prepare. They could assess the Final Settlement Number as a reasonable offer of settlement when the jury verdict potential was high, that Navigators failed to make a proper investigation of the claim prior to refusing an offer of settlement within their policy limits, that Navigators disregarded the sound advice given in Bell's periodic reports, and/or find serious and recurrent negligence in Navigators' handling of the claim. Summary judgment for Defendant is therefore inappropriate. *See Commercial Union Ins. Co. v. Med. Protective Co.*, 136 Mich. App. 412, 423 (1984) ("Once plaintiff made factually supported allegations of bad faith, the matter was a factual issue and

summary judgment was inappropriate."), *aff'd* 426 Mich. 109, 125 (1986).

### iv.   Motion in Limine

One last note: Plaintiff also filed a motion in limine to exclude the testimony of Timothy Yessman, which was filed as Exhibit 32 to Defendant's motion.  ECF No. 39 (Motion in Limine).  Broadly speaking, Yessman is allegedly experienced in the insurance industry, opines that Navigators' conduct was consistent with the custom and practice of the insurance industry, and opines that their conduct was consistent with the requirement of good faith and fair dealing.  ECF No. 43, PageID.1082 n.5; ECF No. 43-33, PageID.1540, 1560 (Yessman report). Even assuming, for purposes of this opinion at summary judgment only, that the report is admissible in its entirety, a reasonable jury could assign little weight to the opinion and give greater weight to the other evidence and factors described above, and the decision to do so would not be unreasonable.  Even if admitted, a jury could disregard Yessman's legal conclusions as to good faith and fair dealing.  And even without a rebuttal expert opinion, on the totality of these facts a

reasonable jury could disregard Yessman's testimony as to the ultimate issues in this case and find liability against Defendant.

## V.   CONCLUSION

Therefore, the court **DENIES** the motion for summary judgment (ECF No. 43).  A scheduling order will follow setting dates for remaining pretrial deadlines and trial.  The court will hold argument on the motion in limine (ECF No. 39) at a later date and issue an opinion on that motion closer to trial.

**SO ORDERED**.


Date: October 28, 2025                    s/F. Kay Behm
                                          F. Kay Behm
                                          United States District Judge